FILED - USDC-NH
2020 OCT 13 PM 12:50

Brad Smith
Reg. #19541-035
USP Terre Haute
PO Box 33
Terre Haute, IN 47808

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

BRAD A. SMITH,
        Petitioner,

V.

UNITED STATES OF AMERICA,
        Respondent.

    Cv Case No. Unassigned

    Cr Case No. 16-91-01-JL

**MOTION TO VACATE, SET-ASIDE, OR
CORRECT SENTENCE UNDER 28 USC §2255**

Petitioner Brad Smith was convicted on April 7th, 2017 of Six Counts of Violating 18 USC §2251(a). Petitioner was sentenced January 26th, 2018. Petitioner then filed a timely appeal which was denied March 15, 2019. Certiorari to the United States Supreme Court was denied October 7th, 2019.

Pro Se Petitioner now files this timely motion under 28 USC §2255 to Vacate, Set-Aside, or Correct Sentence.

Grounds for relief are as follows:

Prosecutorial Misconduct;

Police Misconduct;

Judicial Abuse of Discretion; &

Ineffective Assistance of Counsel.

These grounds resulted in errors of constitutional magnitude, a sentence outside the guideline range, and the conviction and incarceration of a person who is actually innocent.

## I. Discovery Violations

Prior to trial, counsel requested discovery through a standard discovery form letter. Specific discovery was not requested at that time, however the government has a Continuing duty to disclose information which is either exculpatory or material. See

(1)

<u>Brady v Maryland</u> 373 U.S. 83 (1963) "Prosecution violates due process when it suppresses evidence favorable to the accused, and said evidence is material to either guilt or punishment."

The following are specific examples of evidence which was in the government's possession, but never shared with Petitioner. Much of this information was requested in numerous FOIA requests to the agencies who may still have it, although to date all agencies continue to refuse to answer the FOIA process (See Requests for Judicial Notice, this case).

Defense counsel was made aware of each of these items, but failed to make any specific requests to obtain them. Items under this heading are both violations of discovery under <u>Brady</u> and also failure of counsel to provide constitutionally effective assistance.

### A) Home Security Camera Videos

The camera system in my home in Louisiana consisted of four seperate cameras on two seperate recording systems. There were two hard-wired cameras mounted to the walls in my bedroom (See discovery photos Bates numbers: 16R009-000271, 16R009-000272, 16R009-000233, 16R009-000234) There were also two wifi based "Nest" Cameras. One was mounted to the bedroom wall (See discovery photo Bates number 16R009-000234), and one on a shelf in the kitchen, overlooking the room and facing the door. There is no photo of this camera, because it was removed by police prior to photographing the search of my home on January 14th, 2016. (Cannot Provide documents because BOP staff have illegally intercepted priviliged legal communications and destroyed/altered discovery materials. See letter from Attorney Guerriero).

Of the three cameras which were left installed, the two hard wired cameras, which could not be unplugged, were turned to face the wall during the police search, and the upstairs Nest Camera is turned, then eventually unplugged to prevent the cameras from recording the police inside my home. (Cannot provide photos or Bates numbers, because

BOP staff has illegally intercepted privileged legal communications and destroyed/altered discovery material. See letter from Attorney Guerriero).

Removal of these devices, or even merely preventing their normal activity is a violation of the first amendment. The self-authenticating nature of a video makes it unparalleled in the arena of evidence. Here there are only two reasons police might have for removing the devices.

1) To prevent them from recording the police, and limiting the stock of information from which the public (or the Court) may draw.

2) To attempt to collect the information from them pursuant to the warrant they were searching under

Here, because neither the cameras or their recordings were ever listed on the search warrant return, nor turned over as evidence despite the efforts police took to obtain them, the logical conclusion may be that the government wished to prevent their production. Further support for this conclusion is what they might contain:

The camera in the kitchen recorded the entire encounter with police, both audio & video. The camera was mounted over the stove on the top shelf in front of some copper tubing. It is undoubted that Agent Lopez saw the camera, as he commented on the tubing, asking during the portion of audio presented as evidence "is that a still?" and wondering if he needed to call ATF. Because the camera would have recorded a very contested period of events in this case, it is obvious that its value as evidence would be very high. It should therefore have been preserved (or at least documented) once it was seized.

The cameras in the bedroom would have recorded Trooper Kibodeaux's search of that room, and subsequently the later search of that room by Louisiana State Police and HSI agents. Police efforts to destroy/alter those videos is even more well documented. In the above mentioned photos the cameras are all plugged in but turned to face away from a useful line of sight. Later photos (unavailable here due to destruction/withholding of discovery by BOP officials) show the Nest Camera has been disconnected, even later photos show the larger hard wired cameras have had the cables pulled from the ceiling

( 3 )

in an effort to trace the recording device (See discovery photos, Bates #16R009-000639)
Phone calls recorded by the jail in Louisiana reveal that police had even removed the
wood moulding to get into the ceiling. All of this effort, and not a mention of the
cameras in any report. Trooper Kibodeaux even lied about the cameras twice during the
suppression hearing. See Suppression Transcript Day 1 - Kibodeaux.(First claiming no
cameras existed at the gate when police arrived for a knock and talk, then claiming
she was unaware of any cameras in my home until someone told her after the search. This,
despite discussing them in the interview at the police station prior to the search.
(See police interview video) "you obviously have cameras in your room..."

The upstairs cameras would have been useful (had they remained unmolested) in de-
termining who exactly confiscated a Bryco Arms .380 pistol from the house without pro-
viding the property receipt, or listing it on the warrant return. They would also help
to explain how the sneakers the government took into evidence arrive in my bedroom, two
weeks after the search of my home, in a place that had already been searched and filmed
without them being there. (See Affidavit of Brad Smith).

The suppression of the home security cameras violated the 1st amendment by prevent-
ing extremely valuable evidence from being presented. The violation likely protected
multiple instances of police misconduct. Failure by counsel to obtain the videos, or
even to adequately investigate the suppression of those videos by the government was a
constitutional error resulting in massive prejudice against the petitioner.

## B. Statement of the Defendant

When the police initially began the "Knock and talk" encounter in Louisiana, Agent
Lopez started by questioning Petitioner regarding certain identification and contact
information. He handwrote the answers to these questions on blank paper on a clipboard.
(Supp Trans. Day 1, Lopez). Because these were contemporary and verbatim, these writ-
ten answers were discoverable "statements of the defendant" and not merely "notes".
Several important facts are premised on Lopez's later polished and detail-free report,

which are likely to have been found differently if the original report had been turned over.

1) The original handwritten report contained information from the Driver licenses of both Meghan Hanna-Stevens and Petitioner. The fact that Lopez had seized our IDs necessitates a finding of arrest and not of consent as the court found here.

2) Lopez's claim that Petitioner admitted to using Yahoo! as a backup email would be easily disproven by the production of the original report. Or, if the Court prefers: The truth was contained on that report. If Petitioner had actually given a Yahoo address as claimed, it would have been written down at that time along with the rest of my contact information. Lopez later said that the whole investigation would have terminated but for petitioner's recitation of that Yahoo address.

The government here has again suppressed favorable evidence and is showing a pattern of limiting evidence to testimony only. Trial counsel claimed the government would turn it over if it existed. Failing to make any attempt to retrieve the document knowing it's importance, or at the very least failing to request sanctions for non production is yet another failure to provide effective assistance.

### C. Trooper Kibodeaux's Phone

During the January 14th "knock and talk", Trooper Kibodeaux collected a great deal of data using her phone. Very little of that data ever became discovery.

Trooper Kibodeaux began the trip by photographing the gate from inside Agent Catalan's truck, an action she denied, but the photos exist in a folder marked "Knock and Talk" that Kibodeaux turned over to federal authorities shortly after it was produced. (See Gate Photo Labeled Knock and Talk). Original copies of this photo were never produced to defense, only reproductions on .PDF format. Originals would contain the photo's metadata, showing the date/time of creation, the GPS coordinates, the type of phone used, and the name (as defined by the owner) of the device used.

Because Kibodeaux denied ever taking photos on the property, this information would be helpful to impeaching that statement. (See Suppression Hearing Day 1 - Kibodeaux) The creation time/date would help determine when police arrived at the gate, and help to establish a factual timeline since even that was a point of contest at suppression.

Kibodeaux then moved into the carport where the Petitioner observed her taking several photos of his vehicle, from multiple angles. She then moved to the end of the driveway to photograph Meghan Hanna-Stevens' car. (See Suppression Transcript Day 2 - Smith). Original copies of all photos, not merely the two provided in .PDF format would be helpful in many ways.

1) Date/times provide another datapoint on the timeline to discover time between entry at gate to entry of carport, or time between arrival at end of driveway to time evidence siezed.

2) Other angles may provide other evidence -

    -May have captured image of 3rd vehicle in carport (Supp Trans Day 1 - Kibodeaux

    - Side area where police claim excavator was located was visible from carport, other angles may have filmed that area of the yard. Any photos taken of this area, visible from carport, would show whether any digging was visible, or any equipment was located in this area. Petitioner would like to resolve this issue because despite the overwhelming evidence to the contrary, both courts to have examined this issue have determined the facts incorrectly, leading to decisions based on incorrect assumptions. Resolution of this issue will have a tendency to strengthen Petitioner's credibility as well.

Kibodeaux then used her phone to detect Wifi networks inside my home. This was done before mentioning I could leave, without asking permission, and prior to informing me why she was there. (See Suppression Transcript Day 2 - Smith, See also pre-Suppression Affidavit of Brad Smith)

A review of this data would show conclusively that police had committed to their second warrantless search of the day. Date/time would also reveal the time when agents first entered my home.

Kibodeaux then began recording audio with her phone, before placing her phone in her pocket. (See Attached Affidavit A) This recording, much like the Home Security Camera in my kitchen, would have recorded the whole exchange between myself and police leading up to the seizure of my computers and other devices.

The fact that this recording has not been produced, reported, or even alluded to is evidence enough of what the recording contains. This court is well aware of the

difference between the government's version of events that day and the petitioner's. The government's version of facts relied on police testimony and a single audio clip which conveniently dodged recording each of the important points of the interview. While the court has suggested that Petitioner ought to have provided witnesses if they were available, and so chose not to credit my testimony because it was uncorroborated, it should have done the same where evidence was available to the government but was not produced in favor of testimony.

The weight of this missing information is obvious and ought to have been produced. Counsel advised that an officer's personal cell phone is not discoverable. I disagree. If a police officer chooses to use their personal phone to collect evidence in a criminal investigation, that officer relinquishes their expectation of privacy over that material. While unorthodox, a subpoena or judicial warrant could have been issued for relevant data within the specific timeframe on that specific day, subject to oversight by a Special Master to protect the officer's personal materials. Counsel here made no attempt and his error was further proof of ineffective assistance.

### D. Catalan's Audio

At trial and suppression, the government offered an approximately 15 minute audio recording from the encounter inside petitioner's home. (See audio of Knock and Talk interview) The agents claim that the bulk of the conversation is recorded here, although most of the events offered by police testimony are unrecorded. In fact, the original unedited recording has never been entered into evidence, nor was it ever turned over to defense in discovery.

According to Kibodeaux, Catalan, and the Petitioner, the recording began before Kibodeaux went upstairs to collect electronics (See Suppression Trans.). Trooper kibodeaux asked agent Catalan to begin recording while she left the room - we can presume because her audio recording would end when she began taking photos in the bedroom, and also because she wanted the entire encounter recorded. This fact is uncontested.

However, the recording provided in discovery begins only <u>AFTER</u> Kibodeaux has returned downstairs, and Lopez is filling out property receipt information. This may seem a small issue, but when one considers the fact that Kibodeaux returned upstairs not once, but twice after her initial upstairs journey, it becomes evident that the missing portion of Catalan's audio is not so trivial. The timing also begs the question, if Kibodeaux was present for the entire recording, why wouldn't she have recorded it herself?

Between the period when Kibodeaux asked Catalan to begin recording and when the recording actually takes place, several important things happened. This court dismissed these events at suppression, but it is worth stating here. Whether the court agrees to these actual facts or not is its prerogative. As a witness, I will recall the things which actually happened and leave the court to determine why the recording conveniently left out these events:

1) Kibodeaux began to go upstairs, to which Petitioner protested and attempted to follow, but was told to "stay put right there"

2) Lopez then announced he needed to "go get bags" referring to evidence bags, and asked Catalan if he would watch me.

3) I withdrew my cell phone and was going to attempt to watch Kibodeaux through the Nest.com app, but the phone was taken out of my hands by Catalan who asked me what he was going to find. I tell him "Nothing" and he begins searching through my photos and other data. I did not give him permission to do so, nor did he ask.

4) Catalan recommends if I knew anything useful to him it would be considered a "Bargaining Chip" and would make police "go easier on me."

5) Lopez returns, does <u>not</u> read consent form. Complains that he forgot to grab a pen and asks to borrow one from Catalan. Catalan gives Lopez two pens from a pocket in his yellow back pack.

6) Kibodeaux returns with laptop, gives to Lopez, then asks if laptop works without cord. When I say no, she returns upstairs without comment or question and retrieves charger cable.

7) Kibodeaux then tells Lopez she found other devices and asks Lopez what he wants to do. (She did not call down and get permission) Lopez tells her "I'm taking everything" (He did not ask permission) Kibodeaux returns upstairs for the 3rd time to collect the "peripheral devices". When she returns, Lopez begins placing the devices in bags.

8) Lopez tears open one bag to collect the device from inside because he had forgotten to record the device's serial number. He then places the device in

another bag and notes the change on the evidence log. (Uses different pen here, not at police station)

9) Lopez then returns my driver's license, which had been clipped to his clipboard since he took it near the driveway.

10) Catalan returns my cell phone.

Then the recording picks up here. The audio file included with discovery, and likely the same file the court has, shows a creation date of January 15, the day AFTER the recording was made (See file date for Audio Interview Knock and Talk). It also has no associated metadata - if it were an unedited original, it would likely show the phone model, phone name and perhaps the name of the recording app it was created with. Instead this file has none of this detail, suggesting it was created with editing software instead. Suppression of portions of recordings is almost more revealing than suppression of the whole file. Here  the police altered the evidence rather than merely suppress it. This allows the government to present the portions which are beneficial to themselves, while preventing exculpatory materials from being discovered.

Trial counsel was aware that the audio was dubious at best and made no attempt to investigate its authenticity. It cannot be 'sound trial strategy' to merely accept all evidence the government chooses to use against you. Trial counsel ought to have investigated the missing portions of the audio.

### E. Body Parts

At trial, the government surprised petitioner by producing photos before the jury of the petitioner's body, and a photo of an uncircumcised penis.

In counsel's motion for mistrial, my level and reasons for surprise are severely understated. After trial, petitioner was able to examine one photo of a penis. I did not recognize the photo or the penis. Because trial counsel claimed the penis in the videos was not visible enough for identification, and also because I was lead to believe the identification photos taken by police would not be used if they were not produced, I did not press the issue and attempt to examine them.

While I did not examine the photos at the time of their creation, I do know that Agent Lopez took 2 or 3 photos of my penis from different distances and angles, and then had me withdraw the foreskin and he took 2 or 3 more photos of the penis with the head exposed. To date, None of those photos has ever been shared with petitioner.

The missing photos depicting petitioner's penis with foreskin withdrawn would have shown a crescent shaped scar on the head of the penis. This area was clearly visible on the charged video and penis in videos does not have such a scar. Further, petitioner's penis has several other identifying features which were not seen in the charged videos. Suppression of these photos was intentional device to prevent exculpatory evidence from reaching defense.

### F. **Originating Email**

This entire investigation began with a statement by Special Agent Desmarets of HSI Detroit in a warrant affidavit claiming that an email originating from smittyb172@yahoo.com and containing child pornography was sent to another email, and no copy of this email exists in the files recovered from Yahoo! See Yahoo warrant affidavit.

Because the entire investigation hinges on this email, and it was never produced, the entire investigation is actually based in the uncorroborated word of an Agent who was never questioned.

### G. **"Law Enforcement Database"**

Agent Desmarets reports that he was able to discover petitioner's location through a "law enforcement database" (See Desmaret's report), but this information was never made available to defense.

It is important to note that, at the time Agent Desmarets was claiming to have discovered petitioner's location, petitioner still held a NH driver's license, had no bills or utilities in my name associated with Louisiana, had my NH mail forwarded to my sister's NH address, and held a NH based pre-paid phone number.

Agent Lopez was not able to locate me on the Louisiana farm until he called the phone

number posted at the gate. (See Lopez HSI Report.)

Also, Agent Desmarets claims the database located me using an 833 phone number associated with the farm. (See HSI Report Desmarets. See also HSI Report Lopez) In reality, the 833 phone number is registered to Sabbow Inc. in Concord, NH and was listed as lost/stolen in January/February of 2015 months before anyone knew about the farm in Louisiana, and was NEVER associated with the farm.

Further, Agent Desmarets received from Yahoo! a list of I.P. Addresses for logins to the Smittyb172 account. Had he researched the logins, he would have found that they originate from Doyleston, PA. These logins start before my move from NH, and continue from the same location after I have moved to Louisiana. (See Yahoo Login data/whois.com attached) Because the information Agent Desmarets did have does not seem to lead to Louisiana, it is likely Desmarets engaged some other technique. Because this statement is the beginning of the investigation in Louisiana, the information the statement was supposedly based on ought to have been produced for inspection.

## H. Late Brady Disclosures

As the court is aware, there was a significant amount of new material at trial that hadn't been disclosed earlier. While counsel's motions covered some of this mater-ial, others went unargued.

1) Unprotected access to electronic devices by Agent Catalan. This remained un-reported until the day of Catalan's testimony, and was disclosed only minutes before Catalan took the stand. Counsel made no attempt to investigate the mat-ter, which was undiscovered by counsel during forensic review of the electronics. Counsel's failure to object caused evidence to be presented and testimony to go unchallenged without any investigation into the evidence. (See Brady notice - Catalan)

2) False testimony of Gov. Witness -
The day before Matthew Smith was to testify, Counsel learned that it had been discovered that he had lied to investigators about a very potent fact. Defense counsel hadn't listed Matthew as a witness, relying on the fact that the gov-ernment planned to call him (See Brady notice - Smith).
Having discovered that Matthew had been accused of raping an underage girl, and that the girl's aunt worked for the Prosecutor's office, counsel ought to have conducted his own investigation, and moved against the AUSA's office for a conflict of interest. Rather than that, counsel argued that the court ought to represent Matthew (meanwhile telling me the prosecutor was insisting Matthew

"Lawyer Up). When I pressed him to question Matthew anyways, he insisted Matthew
was refusing to answer questions and COULDN'T be called. Something I didn't know
was incorrect at the time.

When the AUSA later produced photos taken during interviews of Matthew, when he

had been prevented from testifying, counsel should have raised a 6th Amendment claim

for offering testimonial evidence, without cross-examination. What's worse, counsel

later told Petitioner that this information had been available to the AUSA for at least

several days prior to sharing it with defense counsel. Rather than sharing this infor-

mation then, they used it to collect the photos used at trial. The AUSA's claim that

he had spontaneously discovered the anatomical difference by educated guess was a lie.

The employee whose niece had accused Matthew was where the information originated. The

government then withheld the information long enough to collect the photos it needed

for trial. Defense counsel learned this after trial, and yet made no move to correct

it. (See Attached Affidavit. Attachment A)

### I. Missing Reports / Items on Warrant Return

During the early phases of the investigation, Police conducted various inspec-

tions and seizures which required due process. The following are examples of uncon-

tested Fourth Amendment violations:

1) Search of Cell Phone -
   Petitioner's cell phone was searched twice by police without consent, a warr-
   ant, write protection, or any reporting. The first time occurred in Petition-
   er's house when Agent Catalan took the phone and began searching through image
   files (See Attached Affidavit, Attachment A)

It is uncertain what else Agent Catalan searched at that time, but a forensic

review of the device would detail his activity. The phone was searched a second time

as well, by either Agent Lopez or Agent Lopez and Trooper Kibodeaux.

At first appearance in Louisiana, Agent Lopez and the AUSA in Louisiana began a

conversation about evidence. At one point Agent Lopez asked if he needed a warrant to

search the phone. When the AUSA responded that yes, a warrant was required, Agent

Lopez said, "too late..." and then began to explain that he had been inspecting the phone with Trooper Kibodeaux. They then realized that I was listening, and began to speak in a manner so that I could not overhear. (See Attached Affidavit, Attachment A)

No data from the phone was ever turned over. No official inspection was ever made. I had asked trial counsel to collect the device and have it analyzed to prove it was searched in police custody, but he declined, claiming there would be a loss of evidentiary value if the device left police custody. He claimed that we could authorize the police to search the device which was senseless - authorizing a search in order to prove the police had conducted unauthorized searches... Giving the police the information we were arguing they had no right to possess.

The missing report on the search of this device is another in a long string of government malfeasance of this type. These police weren't merely violating the law, they were covering their tracks too.

2) Search of Tahoe -

After Petitioner's arrest at the Louisiana State Police building, Petitioner turned over his keys to Meghan Hanna-Stevens so that she could drive herself back to the farm. Neither the arrest warrant nor the search warrant authorized a search of the petitioner's vehicle. Petitioner did not authorize a search of the vehicle, nor did anyone ask. Instead, police waited until custody had been turned over to Meghan, then refused to let Meghan leave the police station until she allowed a search of the vehicle. (See jail call to Meghan Hanna-Stevens.) While nothing was recovered from this search, and so, no prejudice can be said to have resulted, it is impotant in the manner in which this was effected. This court was previously reluctant to believe in the devious and illegal or abusive behavior by the agents in Louisiana, this search, and the police's failure to report the search are in line with Petitioner's characterization of police behavior in this case. Counsel should have brought this information to supplement Petitioner's testimony, at least anecdottally.

3) Missing Property Receipts, Warrant Returns -

After the house search, several items were missing, for which there has never been any accounting.

a) Bryco Arms .380 pistol with Case and Spare Magazine (See photos, Bates #16R009-000266 showing pistol, magazine case, and section of Louisiana State Police Property Receipt; 16R009-000267 - close up of pistol and Serial Number. See also Warrant Return Property Receipt 1/14/16.)

b) Glass Jar containing red paint additive marked "THERMITE"

While the pistol and case were photographed, along with the edge of a property receipt, (indicating someone was intending to document the seizure) no property receipt was included in discovery, nor were the items ever included in the warrant return. The items were not in the house after the warrant search, so there is no doubt they were confiscated by police. Additionally, the warrant returns for several seperate searches conducted weeks apart in January 2016 were not filed until early April 2016. This type of bad accounting is rampant in the early stages of this case, the theft of a firearm however, is a criminal matter, and ought to have been addressed by counsel sooner.

### J. Subsequent Search - Photos / Reports

Nearly two weeks after the initial warrant search of the farm and my arrest, Police again descended on 2986 Main Highway to collect more evidence. Despite the original January 14th warrant specifically covering "clothes, shoes, bedding etc." None had been collected.

The second search however turned up several pairs of pants, shirts, and a very specific pair of sneakers. What is unclear is where these items were found. Several photos exist from inside petitioner's home - particularly several photos of large sneakers with neon laces/trim. What doesn't exist, are the photos or reports of items taken from the garage. Only one item seems to have been removed from the garage - A large black toolbox. Consent to search this area granted by Lisa Leblanc who claimed she was entitled to access this area. The police ONLY collected digital evidence during the January 14th search, and then did not search the electronic media they seized. When taken in conjunction with the fact that the police also disappeared the cameras from the house this should raise some suspicions. Why would the police collect all this evidence, and then make no attempt to inspect it? This seems more like a move to control the evidence and keep it from being discovered in case copies of security camera videos had been made and saved to disk.

Lisa Leblanc had been issued a notice to quit from the garage in November 2015,

and was not entitled to give consent to search this area. Notice to Quit will be on file at Sabbow Inc. of Concord, NH.

Photos of this search do not exist. These photos would be important to defense because they would prove the government found a 3rd residence in the garage that they have failed to report (degrading the garage's 4th Amendment Significance) they would also show that the residence was full of Matthew Smith's property. And since several items were reported to have been found in Petitioner's home which were not found there, disclosure of these photos would be helpful in showing the provenance of certain government evidence. Specifically, one pair of Nike shoes, and three pairs of Dickies pants.

The shoes which were far too large for the Petitioner's feet, were discovered covered in mud, lying atop a VISIBLY SMALLER pair of slippers (See Photo Nike Shoes) in his bedroom only after a search of his brother's belongings, and not during the initial thorough search, which included the area the shoes were subsequently found in (and photographed, with no shoes) were actually obtained from the residence in the garage where they were among pairs of similarly sized and styled shoes.

Similarly, the return claims 6 pairs of Dickies work pants were discovered in the Petitioner's house (See Warrant Return 2nd Search 1/27/16). Again wrong. The work pants were issued in sets of 4. Petitioner was wearing a pair when he was arrested. There are at least 3 pair of Dickies pants with a smaller waist size than would fit which had been given to Matthew and were stored among his belongings. No inspection of the pants ever revealed differences in size. Petitioner contends one should be conducted. Whether this was intentional or mere laziness I cannot attest. However, knowing that the sneakers had been moved to be photographed inside my home (facilitated by the tampering of the security cameras) I am inclined to believe this was intentional.

Failure to produce photos which were likely taken during this search or detailed reports of where items were located when found prevents an accurate accounting of who those items belonged to, and forces the conclusion the government wishes. It also prevents discovery of further police malfeasance.

## II. 6th Amendment Right to Counsel

The 6th Amendment guarantees criminal defendants the right to counsel. In 1981 the Supreme Court recognized that this right was invocable at the earliest stages of the adversarial process in Edwards v Arizona. The First Circuit has recognized this ruling (See US v Sweeny, 887 F.3d 529 (1st Cir 2018)) concurring that "once an accused has invoked his right to counsel, he cannot be subject to further interrogation until counsel has been afforded."

During the interview at Petitioner's home in Louisiana, police asked Petitioner if he would be willing to come to the police station to answer questions or would he like to speak to an attorney first, to which Petitioner responded he wanted to consult with an attorney. This portion of the conversation was recorded, and was entered into evidence by the government (See Knock and Talk Audio).

Despite this, police continued to question petitioner, then left. Once police had left, they contacted petitioner twice more to ask questions and collect evidence. Finally, police lured Petitioner to the police station under the guise of collecting his property. Once at the police station, Trooper Kibodeaux begins by asking Petitioner if he's had a chance to speak to an attorney. When Petitioner answers in the negative, Kibodeaux commences with interrogations anyway.

Petitioner was later asked to sign a miranda waiver, which Petitioner signed after checking the box marked "Not Waived". Thereafter, Kibodeaux and Agent Lopez returned to meet with Petitioner at the Parish Jail in Louisiana where they attempted to question him again.

These violations were recorded, and are already a part of the record. Counsel was aware of these issues at a very early stage, and even had conversations with Petitioner about Petitioner's desire to argue against them. Appellate Counsel received a letter from Petitioner suggesting he argue the 6th Amendment issue on Direct Appeal (Unavailable due to BOP Staff interception).

After having stated that Petitioner did not wish to be interrogated without coun-
sel, police obtained written consent to search, passwords to Petitioner's laptop, and
various other inculpatory statements all of which were used at trial in violation of
the Petitioner's 6th Amendment Right to have counsel present. Counsel was constitution-
ally ineffective for failing to challenge the admission of this evidence.

### III. 5th Amendment Due Process / 6th Amendment Speedy Trial Act

Petitioner was arrested by Louisiana State Police who were assisting in what was
originally a Federal investigation. Before a bail hearing could be held on the State
charges, a U.S. Marshall "hold" was applied on January 15th. This hold prevented bail,
although Petitioner could have made bail on the State charges. Because this made Petit-
ioner "subject to formal restraint" the Marshall hold became an "arrest" for purposes
of the 6th Amendment, and the Speedy Trial Act.

There is ample evidence to support the conclusion that the State prosecution was
a sham, devised to allow the Federal Government to circumvent the normal restrictions
placed on it by the Constitution and the Speedy Trial Act.

1) Louisiana Prosecutors did not file a "Bill of Information" within the 60 day
   timeframe, indicating they had no intent to prosecute. Likewise, after Petit-
   ioner was moved to New Hampshire, Louisiana discharged the cases - Declining
   to Prosecute (See St Martin Parish - Decline to Prosecute)(Attached)

2) Trooper Kibodeaux immediately turned over Petitioner's cell phone to Federal
   Agents on January 14th, the day of his arrest, indicating a knowledge that Fed-
   eral charges would be filed in preference to the State charges she had filed
   in order to have Petitioner detained (See Kibodeaux's Arrest Report)

3) Charles Morley sent a representative to Louisiana to take possession of the farm
   and commence eviction proceedings. A Notice to Quit was first entered on Febru-
   ary 1st, 2016, and indicates the police were aware of Petitioner's incarceration
   and also of his impending extradition. Petitioner was not aware at this time
   that any extradition was pending. (See Attached Notice to Quit)

4) A Customs and Border Patrol property report obtained by Petitioner in October
   2019 shows that all evidence collected by Louisiana State Police on January 14th
   was turned over to U.S. Immigration and Customs Enforcement on January 19th,
   2016, only five days later. (See Attached ICE Property Form)

5) Finally, emails from Gary Russo, appointed counsel in St Martin Parish, indicate
   that he was appointed, but was told in advance that State charges would be

dropped. These emails were obtained by the trial counsel, but are not available to Petitioner due to the illegal interception of privileged mail by Prison Staff, who have repeatedly altered or destroyed discovery materials. These emails are potent for two reasons:

- They show that the State Prosecution was a sham, used as a device to aid Federal investigators to circumvent Petitioner's Constitutional rights; and

- They show that during this critical time, Petitioner was effectively without counsel, due to counsel's understanding that State charges would not be pursued.

Once the Marshall hold was applied, the normal rules applying to detainers ought to have applied. In other circumstances, counsel would have aided in seeking immediate commencement of prosecution on Federal charges. Here, not only was Petitioner unaware of the hold, but counsel was unwilling to provide any assistance whatsoever.

In January 2016, Louisiana Public Defender program went through massive budget cuts. These cuts placed public defenders on part-time status, cancelled state-funded representation for any person who made bail on their charges, and forced public defenders to prioritize cases based on need.

Here, because counsel was aware the Louisiana charges were bogus and would go away on their own, he made the necessary but unethical choice to provide no assistance at all, save the pro-forma motion to quash when the State failed to file a Bill of Information after more than 60 days. (Petitioner has requested information on this from St. Martin Parish Pub. Def Office, but he's yet to receive any response)

This period when Petitioner was without counsel on prosecution which was clearly designed merely to hold Petitioner, and not to effect actual prosecution, prevented Petitioner from receiving Constitutionally guaranteed right to counsel. During this period, Federal Agents searched Petitioner's property several times collecting evidence which was eventually used at trial. This property was unavailable to Petitioner while incarcerated, and because he was nearly 2,000 miles from friends or family, he was reliant on counsel to attempt to collect favorable evidence from his property. In fact, nearly all evidence favorable to Petitioner was among his property stored at the Louisiana Farm.

Police were aware that the property was under eviction proceedings and used this time to collect what information was useful while preventing Petitioner from that same information.

The eviction forms, which weren't obtained by Petitioner until November of 2018 show that although police knew the location of Petitioner, they chose to post the notice of eviction on the front door. (See Attached Notice to Quit, Summons) No notice appears on the door in search photos dated 1/27/16, so it is apparent that police left the notice on the door to the main residence.

Petitioner was not allowed to contact the landlord of the farm due to a no-contact order. Despite this, Petitioner made multiple attempts to make arrangements to collect his property (See Jail Calls-Toni Mitrano, Failed Call to C. Morley) which all went unanswered.

Later notices from Breaux Bridge City Court weren't sent to Petitioner's current address in St Martinville Parish Jail, but to the farm itself, then under control of Eric Bailey, the Movant in the eviction proceedings. Those proceedings became final on February 22nd, 2016. The City Marshall delivered Petitioner's property to the victim in the criminal case on February 23rd, 2016. All of this was done without notice ever being served to Petitioner.

Three days later, on February 26th, Petitioner was formally arrested on Federal charges. This arrest could have occurred at any time, but was delayed until after the eviction was final, and access to Petitioner's property was impossible. This is another instance of careful control of information by these same police.

The loss of this property was used to gain a tactical advantage by Federal Agents, first by depriving Petitioner of all evidence but what had been cherry-picked by Federal agents. The evidence lost included receipts and invoices proving dates of purchase for devices the government seized, and would dispute the theory the government used at trial. It included videos from the security system in Petitioner's home. It included other physical evidence such as clothes, shoes that would have added credibility to

Petitioner's statements. It included invoices for the farm business including the $5,800 bill for property line surveying, ordered by Charles Morley for fence repair, the $850 bill for new gate motor to make sure the property remained locked, the $110 spent for new "No Trespassing" signs.

These would have supported the conclusion the property owners intended to keep uninvited guests off the property. The government later procured testimony from Mr. Morley which he seemed ambivalent on the security of the property. This testimony would not have held up under the presentation of evidence that Mr. Morley had spent nearly $6,800 in a few short months in fencing and gates.

In addition to these losses of evidence, Petitioner lost nearly $65,000 worth of personal property, which he may have used to hire experts, counsel, or effect bail.

This false prosecution also forced Petitioner to rely on the arresting agents to collect photos from the property, which only happened 9 months later, and contained only photos which helped investigators testimony. No photos were taken of the area where the Petitioner was supposedly digging, nor of the area "behind" the garage where the encounter actually happened.

The prejudice resulting from the sham prosecution colored the entirety of this case through trial. There existed enough material for trial counsel to have objected pre-trial, and counsel was well aware that Petitioner was distressed by this issue.

Counsel's failure to address this issue was another instance of his Constitutional ineffectiveness.

### IV. Failure to Develop 4th Amendment Claims

Prior to trial, trial counsel presented a 4th Amendment claim and motion to suppress for the Yahoo! warrant issued in Michigan, and also for the warrantless intrusion onto the Louisiana farm. Counsel failed to provide effective assistance by failing to fully develop those claims by bringing evidence and citing relevant law.

### A. The Yahoo! Warrant

Trial counsel originally argued that Magistrate Judge Elizabeth Stafford had no authority to issue an out-of-district warrant to California. The government contended that §2703 of the Stored Communications Act (SCA) authorized extra-territorial warrants. Trial counsel conceded without argument. This begins a pattern with trial counsel failing to argue against government points - either trial counsel was unprepared, or was being lazy. Either way, counsel's lack of zeal was ineffective.

### 1. The Warrant Application

The application for search warrant to search Smittyb172 signed and sworn to by Agent Devallons Desmarets of HSI, Detroit, MI uses form language that is nearly identical to the application for the email which spawned the Smittyb172 investigation (See Warrant Application PornLovePorn@yahoo.com). It contains no idiosyncratic information about a specific person whose data is to be searched and seized or why it is not feasible to search on site, nor does it indicate why the applicant is expecting the search to yield so many unopened inbox communications - which is the only type of communication discussed by the SCA. Simply because a search might take days or weeks or contain voluminous documents doesn't mean that it will in each case. The very fact that the warrant application suggests such a search period might be necessary, or will contain a large multitude of document types indicates that the requesting Agent had no idea what he was looking for, turning the warrant into a license to fish. Certainly if you cast a broad net, you are more likely to catch something. This however runs afoul of the Fourth Amendment's preclusion of General Warrants.

The application does not mention which specific types of files or communications are to be searched, it merely encompasses all files in all communications in all states of communication for the entirety of the account. This is akin to a warrant authorizing the seizure of an entire house and all of the property therein without restriction based on evidence of a single drug transaction. The application requests types of comm-

unications to be seized which §2703 does not apply to, it requests the seizure of inno-
cent data and communications and it requests the violation of private 2-party communi-
cations for all people who aren't implicated in any crime. This was the second email
searched in this manner by Agent Desmarets that Petitioner is aware of, and it is like-
ly there were many more - increasing the violation of privacy by government, exponent-
ially with each overbroad warrant.

The application failed to include why <u>ALL</u> files must be searched, or why <u>ALL</u> files
should be retained. It doesn't identify which items were <u>specifically</u> within the scope
of the search warrant:

- "Evidence of Crimes" is not specific enough to meet 4th Amendment Criteria.
  Likewise, emails containing identification information or other useful data
  are not "Evidence of Crimes." Address lists without more are also not "evi-
  dence of Crimes."

This application was flawed from the start by being overly broad, encompassing the
seizure and retention of masses of data which, while possibly helpful to police, was not
authorized under §2703 or the 4th Amendment. The Applicant has wrongly portrayed the
Authority of the SCA. It requests the <u>backup</u> of the entire account contents, but does
not request Delayed Notice.

## 2. The Warrant

Judge Stafford abandoned her judicial role in authorizing both the PornLovePorn@
yahoo.com and Smittyb172@yahoo.com warrants (and likely others). Because the warrant
lacked specificity, authorized the seizure of innocent data as well as evidence of
crimes, did not contain any limiting language or instructions on what to do with data
seized in excess of the warrants provisions for "EVIDENCE OF CRIMES", did not attempt
to buffer the government intrusion by appointing a Special Master and far exceeded
the authority of §2703, Judge Stafford failed to be a neutral arbiter and guardian
between the police and the public, and became a rubber stamp for police abuse.

### 3. The Authority of the SCA

a) The plain language of the statute (§2703) invoked here uses all <u>Singular</u> terminology. That is, §2703 grants authority for <u>A</u> wire or <u>Communication</u>. When analyzing the plain language of a statute, courts are directed to treat the statute as if each word has a purpose, that Congress intended it for a reason. "it is a Cardinal principal of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superflous, void, or insignificant" <u>TRN Inc v. Andrews</u>, 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001) (courts are "reluctant to treat statutory terms as surplusage in any setting")

Here, the word "a" in "a wire communication" is instructive. It tells the Court that it may request by warrant a single communication from an internet service provider. This is in keeping with the "limited scope" the 4th Amendment requires of Judicial warrants, and seems more pertinent when considered with the fact that §2703 authorizes the collection of "A wire or communication" in storage for more than 180 days by simple court order, and not by warrant.

It is highly unlikely that Congress intended to authorize the collection of years of private communications by the government on a less than probable cause standard. Instead, as should be obvious, Congress limited the intrusion to a specific communication, thereby forcing the government to have some specific reason to request it and thereby limit the scope of any seizure to fall well within a probable cause/reasonableness standard. If the court were to reject this reading of the statute, it has authorized the warrantless data mining of private emails by Administrative Subpoena. George Orwell would be proud.

Considering the history and purpose of the statute was not to grant the government authority to harvest data, but to protect subscribers from hackers, it makes sense to use the single terminology interpretation. The subscriber could count each interception of a communication by a hacker a seperate offense, and thereby seek seperate damages

much as the government would have to seek seperate warrants with distinct probable

cause for each communication sought.

Probable cause may exist to search messages of one party but not another. When the

government searches multiple messages from many different parties, it violates the priv-

acy concerns of each individual. The Supreme Court has held that to maintain one's rights,

seperate probable cause must exist for each individual for this not to run afoul of the

4th Amendment.

b) §2703 grants extra-jurisdictional authority, but it limits that authority. An extra-

jurisdictional warrant issued under the Stored Communications Act may seize only commu-

nications in "Electronic Storge". This term is defined in §2510 as:

A) Any temporary, intermediate storage of a wire or electronic communication inci-
   dental to the transmission thereof; and

B) Any storage of such a communication by a communication service for purposes of
   backup protection of such communication;

The first circuit and other have defined this in easier terms - see In Re Double-

click Privacy Litig, 154 F.Supp.2d 497 "Title II only protects electronic communications

stored "for a limited time" in the 'middle' of a transmission, i.e. when an electronic

communication service temporarily stores a communication before delivering it." See

also Am. Health Inc et Al v. Chevere et Al, 2014 U.S. Dist. LEXIS 113809 (1st Cir. 2014)

"When the intended recipient opens an email and chooses to keep that e-mail in the in-

box server, that opened e-mail is not held in electronic storage as defined by the SCA...

Opened email that remains stored in an inbox server is not held in "Electronic Storage'

because it is not in temporary, intermediate storage that is incidental to transmission,

nor is it acting for purposes of backup protection of such communication."

To be even more clear about what communications §2703 authorized, we can examine

legislative intent:

> "Any temporary, intermediate storage [in §2510(17)(A)] describes an
> email message that is being held by a third party Internet Service
> Provider until it is requested to be read"
> (H.Rpt. 107-236 (Title 1) at 57 (2001))

or even more succinctly:

> "Title 18 USC §2703(a) requires a search warrant to compel service providers
> to disclose unopened emails." (H.Rpt. 107-236 (Title 1), at 57 (2001))

In other words messages in "Sent", "Stored", "Saved", "draft" or even "spam" folders do not qualify for extra-jurisdictional searches. Nor do any opened emails, address lists, or instant messages. This means that the originating email which prompted the Smittyb172 warrant was obtained outside of the extra-territorial authority of §2703 and ought to have been suppressed along with anything derived from it, which included the Smittyb172 warrant.

Likewise, nearly everything seized in the Smittyb172 warrant was without jurisdiction and must be suppressed as well.

c) The government obtained a perfect copy of the entire account. §2704 governs "backups" but was not mentioned in the application, likely because §2704 has <u>very</u> specific statutory requirements for obtaining copies.

- Within 3 days of the request to the Internet Service Provider for copies, the government must notify the subscriber, unless the warrant authorizes delayed notice, the procedures for which are outlined in §2705.

This warrant did not authorize delayed notice, nor did the PornLovePorn@yahoo.com warrant. §2704 prohibits disclosure of the contents of a wire or communication within 14 days of notice to subscriber, and then grants the subscriber leave to challenge such disclosure within the 14 days timeframe.

Here, notice was not provided, and the contents of the account were disclosed without allowing the subscriber to challenge. In addition to the 4th Amendment violation, there is now a due process violation, for which there is a statutory penalty.

This delayed notice violation also facilitated the warrantless search of the Louisiana farm. By not providing notice of the search prior to it being effected, police prevented petitioner from seeking counsel to contest the search. Police then failed to inform the Petitioner when Agent Lopez called Petitioner's cell phone on January 8th, further preventing Petitioner from seeking counsel before police could insinuate them-

selves on the farm.

Police then made entry onto the farm without a warrant and having **still** not disclosed the fact that they had searched the Smittybl72 account. Circumventing the notice requirement prevented Petitioner from seeking counsel when it would have been inconvenient for the government.

Under these circumstances, a petitioner must only show that "a search may not have occurred, or would not have been so abrasive had the rule been followed."

Here, had the rule been followed, Petitioner would have obtained counsel to challenge disclosure of the account. Whether or not that prevented disclosure, Petitioner would have been on notice regarding police investigations, and the search of the Louisiana farm would not have occurred, as the police would not have been allowed to remain on the property. Counsel, having been obtained would have directed Pettioner not to engage police for any reason, and likely, the police's warrantless search of the farm prior to making contact would have ended in a civil suit.

Where the same agent of HSI (Desmarets) used the same judge to authorize a search using the same statute on at least two occasions, (and very likely more) suppression is very appropriate. There is a high degree of likelyhood that police will continue to engage in this abusive behavior if left unchecked, and failure to suppress results in further injury when illegally obtained evidence is used against a defendant. This is a 5th Amendment Due Process violation. Even more so, when the evidence is purportedly the defendant's own words. This is nothing more than self incrimination and the court should take a hard stance against this offense, or admit that it places no value in the Constitution whatsoever.

### B. Entry Onto Farm

This court found no issue with police's warrantless entry onto the Louisiana property. Despite the fencing, the electronic gate, the sign with a contact number, and the post supporting a "dummy camera", this court found no indication that police should have

been on notice that they were not welcome to enter. This is a decision that is hard to understand on it's own - for instance a "dummy cam" does not record anything - it serves no purpose other than to DETER MISCONDUCT. This court however determined that a see-through fence design is not meant to keep people out - particularly if they can climb through it. Apparently, the only people who were unwelcome on this farm are the elderly and handicapped.

The First Circuit Court of Appeals declined to rule on this matter, but did find that any violation was not obvious.

Both courts made their findings based on Federal precedent, and never considered local laws. Defense counsel failed to present these facts, leading to an unfair finding.

In Louisiana, the "implied license" police have to enter a property to knock on the door may be revoked, and in Louisiana, this is very easy. In 1982, the Louisiana Supreme Court considered this issue on "State v Roubique". In Roubique, the Supreme Court found that a property owner should not be required to do more than place a sign on the entrance to his property to indicate his desire to prevent warrantless police inspections.

Roubique's property had a small sign on the end of the driveway stating "private road, no trespassing" and the court found this sufficient to revoke the police license, and to render the warrantless intrusion a search for 4th Amendment purposes.

Because this is the rule in the location where the search occurred in this case, the courts here must recognize it. Because the rule was well-established by the time the police arrived at the farm, they cannot be said to have been unaware of it. And because much more was done to this property than that of Roubique's to revoke the police license, there can be no doubt that the police's entrance onto the farm rendered the entire episode an illegal search.

Also, in addition to the conditions at the gate, there were multiple "no trespass-ing" signs placed along the fencing around the property, and the signs at the gate had been removed only days prior to the "knock and talk" in preparation for installation

of "Property Protected by trained wolf" signs which had recently arrived. Agent Lopez would have seen the old signs at the gate during his surveillance of the property before they were removed.

### C. Ruse

Agent Lopez, when first confronted about why they were on the property, explained the police presence as inspecting the farm for illegal immigrant workers. He also mentioned that he was checking "all the farms" in the area, giving the impression that such inspections were standard.

Without giving his real reason for being there, he began collecting evidence for his criminal investigation. Commanding Petitioner to physically produce his ID, and not merely recite the ID's information. Lopez then collected contact information and claimed to have obtained the target email during this exchange. Lopez testified that without this information, the investigation wouldn't have continued.

Both First Circuit Courts to rule on this issue have determined that "Ruses" are Constitutional, without finding any issue with the facts presented here. Trial counsel brought the "Ruse" issue up as an unethical side-point, and then in the face of case law declaring ruses a valid investigative tool, he failed to argue further. Appellate counsel went further, pointing out that police had gotten permission to remain on the property and conduct investigation only because of the ruse.

What both counsels failed to make clear is that the use of a pretext is not always constitutional, and the use of the Administrative Inspection Ruse here was clearly not.

This case has always been addressed as if the farm were merely a home with some agricultural hobby associated with it. This is not the case. As Agent Lopez pointed out, during his surveillance of the property he found that it was listed as a business. Upon entering the property he addressed Petitioner about the farm business - inspecting for illegal workers. Businesses are subject to different 4th Amendment standards. In 1987 the Supreme Court of the United States addressed this issue in New York v. Burger,

96 LED2D 601, 482 U.S. 691 ("an owner of a business has a reasonable expection of privacy in commercial property which is different from, and less than the expectation of privacy in an individuals home.")

The court found that in closely regulated industries warrantless administrative searches were appropriate as long as:

1) There is a substantial government interest that informs the regulatory scheme pursuant to which the inspection is made.

2) The warrantless inspection is necessary to further the regulatory scheme, and

3) The statute's inspection program, in terms of the certainty and regularity of its application, provides a constitutionally adequate substitute for a warrant - it must (a) advise the owner of the commercial premises that the property will be subject to periodic inspections undertaken for specific purposes, and (b) limit the discretion of the inspecting officers by carefully limiting the inspection in time, place, and scope.

Here, there can be no doubt but that the farm would be subject to such inspections - Numerous federal statutes require the operator of a farm business to make records available for inspection or allow Federal officers to inspect work areas etc. (See OSHA 29CFR §1903 "inspections", 29 USC §657 granting Authority to federal inspectors to enter and inspect any business... at any reasonable time or regular working hours) (FLSA 29 USC §211 granting authority of federal agents to investigate and gather data on wages, hours and other conditions of employment- "may enter and inspect such places and such records, question such employees to determine whether any person has violated" provisions of FLSA §§201 et seq)(MSWPA 29 USC §1823 - Safety of Housing for migrant/seasonal workers, housing must be properly inspected and permitted/29 USC §1831 Required to keep records on employees and conditions 29 CFR§500.7 grants designee authority to enter and inspect "places" including housing and vehicles/29CFR§500.135 (housing) 29 CFR §500.140 (enforcement) (INA 8 USC §1160 "Special Agricultural Workers" 8 USC §1324 "Bringing and harboring certain aliens" making it a crime to harbor illegal aliens) and various regulations providing civil and criminal penalties for interfering with Federal Agents (See 20 CFR §500.8 - "It is a violation of section 512(c) of the

Act for any person to unlawfully <u>resist</u>, <u>oppose</u>, <u>impede</u>, <u>intimidate</u>, or <u>interfere</u>  with any official of the Department of Labor assigned to perform an investigation, <u>inspect-ion</u>, or law enforcement function pursuant to the Act during the performance of such") (Emphasis added)

Along with this, there are various Louisiana statutes a farm must be prepared for inspection under. Pecan trees also require spraying for pests and fertilizer, & Petitioner was required to hold a Permit and license to administer these chemicals. People who fail to follow these rules are subject to fines, criminal penalties, and loss of license for failure to comply.

Having made clear that Petitioner expected such regulatory inspections, we should also note that Petitioner had only been in Louisiana, and in farming in general for a few short months. A fact that was known to Agent Lopez. Petitioner argues that if police were claiming to be conducting an administrative inspection which he was unfamiliar with, it did not interfere with his knowledge and understanding of administrative in-spections generally. Therefore the safe route in this situation would be to acquiesce to police's claim to authority. After all, police made no attempt to inform Petitioner that he was free to go or had no obligation to answer questions until after they had taken his ID (to "make sure" he wasn't an illegal worker himself) and gained entry into Petitioner's home.

The <u>Burger</u> court allowed the warrantless inspection stating,

> "So long as a regulatory scheme is properly administrative, it is not rendered illegal by the fact that the inspecting officer has the power to arrest individuals for violations other than those created by the scheme itself."

Since <u>Burger</u>, other  circuits have found that the use of an administrative in-spection may not be a pretext for a criminal investigation. <u>Ruttenberg v Jones</u>, 603 F.Supp.2d 844 (4th Cir. 2008) ("Although administrative searches are a recognized exc-eption to the traditional warrant requirement, they cannot be used as a pretext for what is, in reality, a purely criminal investigation. Otherwise such inspections could serve as a convenient circumvention of the normal strictures placed on law enforcement

officers. An administrative search should be considered a pretext and thus deemed impermissible, if the inspection was performed solely to gather evidence of criminal activity"), Club Retro LLC. v Hilton, 568 F.3d 181 (5th Circuit 2009) ("even under a valid inspection regime, an administrative search cannot be pretextual. The government may not use an administrative inspection scheme to search for criminal violations") US v Hardin, 539 F.3d 404 (6th Circuit, 2007), US v Johnson, 994 F.2d 740 (10th Cir 1993), Bruce v Breary (11th Cir 2007) ("in an administrative search case, a factual finding of pretext on the part of officers who are seeking solely to gather evidence of criminal activity requires the legal conclusion of unconstitutional unreasonableness") emphasis added.

Here, the record is clear - officers were conducting a criminal investigation. Under the pretext of an administrative inspection, they gathered information. By the officer's own admission, without this information, the investigation wouldn't have continued. (See Suppression, Day 1 Lopez) The Court has made a clear error in its determination that this encounter was consensual. Petitioner stated in suppression that he did not feel he had a right to refuse. Administrative statutes in Louisiana and Federally provide penalties for refusing inspections. Further, Police had taken Petitioner's ID, and failed to notify him he was free to leave or not answer questions until they had already gathered evidence in the criminal investigation and had used the ruse to gain entry into his home.

Counsel's failure to address this pertinent legal issue allowed the Courts to make a flawed legal finding resulting in prejudice to the Petitioner.

### D. Peripheral Devices

After a two day evidentiary hearing on suppression, this court found that Petitioner granted oral permission for police to search for and seize his electronics, then gave written consent to examine the devices once they had been seized.

Testimony given at that stage however never claimed that Petitioner granted per-

mission for police to sieze any device other than his laptop. Despite the fact that
Petitioner contests the issue as a whole, if even assuming the facts as asserted by
the police are correct, no discussion of consent ever occurred regarding any other
device.

Police testified that when consent was given, they were unaware of any other de-
vices, and so, the court cannot assume that consent, even if it was granted, was for
any other device but Petitioner's laptop.

Kibodeaux was the only government witness to offer testimony on the other devices,
claiming that when she discovered them, she called to the other officers to notify them
of her discovery. At no  time does she or any other officer claim that there was a dis-
cussion about consent for other devices. Kibodeaux next claims that she seized the oth-
er devices and returned downstairs with them. (Suppression Day 1)

After that, the only other testimony on this fact comes from petitioner. Because
it was not contradicted, the court ought to have found it to be a fact.

Petitioner testified that Kibodeaux came downstairs with the lapop, turned it over
to Agent Lopez, and asked LOPEZ  what he wanted to do about the other devices. Lopez
responded that he was "taking everything" and Kibodeaux returned to the bedroom to co-
llect the other devices. (Suppression Day 2)

The consent to search form was signed only after devices had been seized and placed
in evidentiary bags. The court somehow discredits Petitioner's testimony on this fact,
despite the very detailed description of how Lopez had sealed the evidence bag before
collecting the serial number of the device and upon trying to open the bag at the seal,
it tore the body of the bag itself. Lopez's explanation for the "rebag" was to point
out he used different pen so it must have happened later.

The court's finding that consent was given beforehand was clear error and should
have been addressed on direct appeal. Counsel was made aware, but chose to focus on
other issues instead.

Because the devices were seized without a warrant of consent, their seizure was

unreasonable. Consent given when police already had the devices in custody was not freely or voluntarily given, and was the direct result of the device's seizure. No event happened between seizure and later written consent to purge the taint of the seizure, and so the devices must be suppressed.

Had counsel presented these compelling issues and their associated evidence, it is very likely the outcome of the proceedings would have been different. Failure to do so was unconstitutional ineffective assistance of counsel.

### V. Failure to Investigate / Discover Evidence

### A. Google Glass

Testimony elicted at trial by the government claimed that Petitioner's Google Glass device was used to create the charged videos. This testimony has considerable weight against Petitioner, as it not only confirmed the rarity of these devices in general, but assured jurors that the device found in Petitioner's home in particular was the one which created the charged videos.

Those facts are compelling. I did own a Glass device. Such devices are uncommon. Ipso Facto... However, the videos in question did not have any information indicating they were created using Glass. This was derived from photos associated with the charg- ed material.

Trial counsel was made aware at a very early stage that Petitioner's Google Glass device was purchased late August 2015. After Petitioner had moved to Louisiana, and that any review of the devices' disk would reveal this. In letters from counsel, coun- sel seems to suggest his understanding is that the device was broken during the time- frame in question and could not have made the images. In fact, the device wasn't shipped from Google until August/September 2015, wasn't activated until September of 2015, and arrived via UPS on the farm in Louisiana. These facts do not fit the facts from the videos. In the charged images, the barn has no chicken enclosures or tack room, projects which had been completed before the move to Louisiana. Appellate coun-

sel was able to get agents to admit that the Glass device taken from my home was never searched, despite police being aware that it had it's own hard drive, and would likely have had evidence of the crimes in question contained on it. (See Sentencing Transcript)

Because this device does not contain evidence of the charged videos, and in fact will not contain evidence of any content before the August/September 2015 timeframe, then the government's theory has a serious flaw. This can only lead to two conclusions
- The images were created using someone else's Google Glass, or
- The metadata from the images was altered to bolster government evidence.

The idea that the government may have altered evidence ought to be examined thoroughly. Agent Catalan himself admitted that he had made unprotected access to at least one device. This was not discovered by counsel's investigation, meaning it was covered, or the review by counsel was inadequate. No detailed report exists from Catalan's review and so it may be impossible to know what changes may have been made while devices were in his possession.

Evidence of the device's origin (Receiptes, Packing Notice, etc.) was on file in Petitioner's home, and was lost during the illegal eviction proceedings.

## B. Western Digital Device

Police claimed Petitioner gave the password for this device during a phone call after the Knock and Talk. Catalan claimed Petitioner gave a password, which worked the first time (Suppression Transcript Day 1 Catalan). Petitioner's testimony indicated that he did not know the device had a password or what the password was. After several failed attempts, Petitioner gave police the password to his laptop, which police claimed opened the WD device.

Information gained from Western Digital website indicates that these devices do not require a password when connected to a known computer. Further, the device has a login attempt record and registers failed attempts.

Counsel made no attempt to investigate this fact, which would have shown that the government was eliciting false testimony from its agents. While the subject may have no bearing on the meat of the case, failure to point out the instances where police have lied in general, leads to the Court's incorrect finding of credibility.

### C. Cell Phone

Trial counsel made no attempt to secure data from Petitioner's cell phone despite knowing it contained helpful information. Counsel actively dissuaded Petitioner from seeking the evidence from the phone claiming it would lose evidentiary value if it left police possession - Although for police to seize the property without EVER searching it was unreasonable.

Counsel was aware that the phone had been searched by Agent Catalan, and again by Agent Lopez. Records show that the phone was given to Agent Lopez by Trooper Kibodeaux the day it was seized, however no chain of custody exists from that day until it miraculously appears in New Hampshire and Agent Posthumous created a property receipt for it. (See Property Receipts HSI            )

Counsel never questioned this faulty chain of custody. Counsel never gathered data from this device, which would have shown two warrantless searches by police. Because these searches were unmonitored and unreported, there's no way of knowing which parts of the investigation were affected by these searches. Because it is possible to access Petitioner's ISP account from the cell phone, police may have had access to many places protected by the 4th Amendment.

Other data from the phone would have shown the call from Lopez on 1/8 was much longer than he reported, lending to support petitioner's testimony. Texts from Sue Morley would show that the victim was excited to be visiting petitioner soon, and counters later testimony that the victims have been scared etc. Other texts show that Matthew Smith had stolen money and other items when he left Louisiana and had made threats about trying to seduce petitioner's girlfriend due to being fired. Photos from the phone would

show that Matthew Smith wore blue Dickies pants despite his testimony to officers to the contrary. The call log would have provided data on when the police arrived and show that the farm encounter was much longer than police allege.

Additionally, a call recording App was used by Petitioner around the same time as the January 8th call, and may have recorded that conversation.

### D. Post hoc Additions to Police Reports

1) During the 1st encounter police claimed Petitioner admitted to using Yahoo. Trial counsel was aware this was untrue, and was even given several ways to disprove it.

    a) Toni Mitrano was aware that Yahoo! was hacked and had been receiving messages from the Smittybl72 yahoo account even after petitioners arrest. (Jail call to Toni Mitrano)

    b) Yahoo! Login I.P.s show location logins occurred

      - When Appellate Counsel was appointed, discovery was sent to Petitioner. Most of it Petitioner had never seen. This included the Yahoo logs. These were collected for a one-year timeframe between May 8th, 2015 and March 7th, 2016. Only two I.P. addresses accessed the Yahoo account during this whole timeframe, both from Doyleston, Pennsylvania. These logins begin while Petitioner was living in NH, continue from the same location once Petitioner moved to Louisiana, and continue after Petitioner was arrested. It is likely, these logins continue to this day. (See Yahoo Subpoena Information)

    c) Lopez's original handwritten report was never released, and counsel made no attempt to collect it, claiming it would be disclosed if it existed. Testimony proves it existed.

2) Age of Laptop -

Police claimed we discussed the age of the laptop, and that Petitioner claimed the laptop had been purchased 6-7 months prior.

Petitioner's testimony at Suppression did discuss that the laptop had a prior owner, which came up when he refused consent to search.

The laptop was actually in Petitioner's possession for nearly 5 years. Petitioner's father owned the computer before then. Windows had crashed 6-7 months prior to this encounter, but this was not discussed.

This report is not based on testimony as police allege, but rather on information learned during Catalan's forensic review.

between Louisiana Public Defenders and himself. Original state counsel claims he was never asked to look into the videos although he does recall some discussion about them. The emails also reveal that State counsel was not invested in this case, as he had been told it would be pursued in NH. They also reveal a very low opinion of State counsel's work ethic by the Louisiana Public Defender attorney.

Trial counsel did recover a screenshot of the NEST.com user homepage from Petitioner's account, showing two cameras were associated with the account, one registered to the kitchen another is unassigned. This image was provided to Petitioner but is not available here due to lack of access to discovery material. Despite numerous requests to staff since May, no access to my own discovery has been allowed. Further, staff refuse to make prints of any material requested, even for purposes such as legal exhibits. A copy of this image may be available from defense counsel.

When confronted with the lack of investigation, trial counsel resumed his standby argument that if the videos existed, they'd be produced by the government. He made no attempt to subpoena the videos from NEST.com, have the videos produced through discovery or otherwise. The videos were not recovered by defense, and Petitioner fears they have been lost.

Because the events which occurred inside the Petitioner's home have such an important role in the determination of this case, the evidence those cameras collected is maybe some of the most important. Even more so, since the events were so drastically contested. Trial counsel placed almost no value in collecting these videos or at least determining what had happened to them. He placed no emphasis on them during cross-examination of police, even though he elicited lies about their existence from Trooper Kibodeaux twice. Once, when she attempted to claim no camera existed at the gate, and again when she claimed not to know about the cameras until after the warrant search was complete. In the video interview at the police station, Trooper Kibodeaux mentions the cameras - before the warrant search even took place. Further, it is highly unlikely that Trooper Kibodeaux might notice a small, wallet sized photo on the side of the re-

frigerator, and not notice three large wall-mounted cameras in a room that's only 13' x 15'.

Counsel explained that, because we could not prove what the videos contained, they had no value. Petitioner believes this is the wrong standard. First, the government has a duty to preserve evidence when it reasonably should know that the evidence may be relevant to anticipated litigation. There can be no doubt that the agents involved here knew those recordings would be relevant. To begin with, they made their own recordings, and knew that those would be important. The agents themselves had to know that their actions were unreasonable, and so, the recordings would be instrumental in not only the criminal case here, but civil litigation which would arise. Evidence photos from the warrant search begin at 8:45pm on January 14th, but show that Petitioner's home has already been molested by police. In the earliest photos, the camera over the stove which recorded the entire exchange with police IS ALREADY MISSING. This means police were aware that this camera existed, and removed it before any search warrant was issued. Also in these first photos of Petitioner's kitchen is further evidence of pre-warrant scene manipulation – a black pelican case rests on the counter. This case contained items the police were very interested in: Ammunition, smoke bombs, magnesium. This case was located in Petitioner's bedroom on a wire shelf along with a similar "Husky" case. By the time police photographers moved upstairs, the pelican case has been replaced on the shelf, and each of the rooms' cameras has been adjusted to avoid recording police activity.

Later photos from this search show the second NEST camera has been unplugged entirely. Counsel made no attempt to procure from police an explanation as to why they disabled Petitioner's security system – if it was to prevent it from filming themselves, counsel could have raised a 1st Amendment challenge, AND questioned why police would need to act in secrecy. IF on the other hand, police were attempting to collect the videos as evidence, we could have discovered where the videos went.

Jail calls to Meghan Hanna-Stevens reveal that police had removed the moulding on

the ceiling (1st call to Meghan) and photos taken during a second search of Petitioner's house show why: Police had removed it, and pulled the cables to the hardwired cameras in order to trace it to a recording device. The police's interest in those videos is obvious. What is not obvious is where they went once police took them, or what police were trying to hide by disabling them.

These cameras were perhaps the single most important piece of defense evidence. They recorded multiple instances of police malfeasance and likely recorded, or could have recorded instances of criminal activity by police. No sound defense strategy exists in abandoning those videos.

## F. Defendant's "Admission"

This court previously found that the defendant's "admission" was "the most damning evidence against [him]," Consequently, counsel's failure to effectively address this issue was the most damning evidence against him. See Order on Suppression.

Counsel made no investigation of the "facts" represented by the confession, even though police admitted at trial that no investigation on the facts was ever conducted, aside from the point about having used a cell phone to create the charged images. Here, the government asserts that the confession was entirely thruthful except for the device alleged to have created the videos. It is more convenient to claim that Google Glass made the images (and then never search Glass device) than it is harmful to admit the confession was false, even partially.

Counsel ought to have attacked these "facts" with independent sources. A simple investigation would have revealed this statement was rife with such inconsistencies and other problems.

Petitioner's "confession" claims he was cleaning up for the day when the images were created. The images appear to have been made during the period between 12pm and shortly after 1pm. Investigation would have revealed that Petitioner worked from 8:30am through 4 or 5pm on the New Hampshire farm daily. One pm would have been almost direct-

ly in the middle of the workday and cleanup would not have happened for hours. Then Petitioner states next that he continued working afterwards, which directly contradicts the previous statement.

He next states that he had tried synthetic marijuana that day for the first time. Counsel could have interviewed any one of a number of people (Toni Mitrano, Danielle Herbert, Scott Smith) who would have explained that Petitioner had used synthetics habitually until 2014, when they were banned by Executive order by then Governor Maggie Hassan, and became unavailable.

Petitioner claimed that he was upset about losing his job, a point the government underscored by bringing other evidence to show that Petitioner had recently moved from his position at Sabbow Inc.

What the government has avoided, and trial counsel failed to point out, was that he had been hired directly to the farm and was much happier to be working there. The incident on which this point was premised had happened over a month prior to the creation of the charged images, and Petitioner had been offered positions with two local companies in the interim which both offered to pay more. These offers were stored in Petitioner's files in Louisiana and were lost. Counsel was aware of all of this, and of Petitioner's elation over the change of employment.

Further, Petitioner never discussed the actual events on the charged videos. When police bring the subject up initially, Petitioner is asked if he understands why police are concerned, his actions indicate confusion, not understanding. Thereafter, all the information given by Petitioner was derived from information the police supplied.

Since nearly all of the points discussed during the "confession" were inaccurate, false, or otherwise contradicted, the "most damning" evidence in the trial ought to have easily been counteracted by diligent defense investigation.

### G. Statements of Defendant

During the knock and talk, Agent Lopez took a handwritten statement from Petitioner

(Suppression Day 1 - Lopez, Day 2 - Smith). Trial counsel was aware of the contemporaneous report, and that Petitioner contested Agent Lopez's later report, yet made no effort to acquire Lopez's original report. This report was not merely "Notes" as the prosecutor will likely claim here (Rough notes after all are not discoverable under the Jenck's Act) but this was substantially verbatim and contemporaneous statements of the defendant. The information in the handwritten report was entirely contact and identification information, not the type of data open to an officers impressions or interpretations. This report was particularly important because it would put the issue of whether Petitioner actually provided the Yahoo! email address, which according to Agent Lopez was the entire basis for continuing his investigation. Counsel had ample evidence that Agent Lopez's testimony and finished report was false - jail calls recorded in Louisiana show that Petitioner had told police he didn't use Yahoo! Other calls show Yahoo! was still active during Petitioner's incarceration, and the Yahoo! logins prove without a doubt that Petitioner was not in control of that account. Further, they prove that Lopez knew this before ever arriving on the Louisiana farm. Suggesting strongly that police actions on the farm that day were nothing more than aggressive fishing.

## H. Providing of a Website/Username/Password

In the government's opposition brief to the suppression motion, the AUSA claims Petitioner provided a website with a username and password to agents. This website was supposedly a child porn trading forum. This claim was particularly prejudicial right before a suppression hearing as it signals to the court that suppression would be costly, and these "facts" tended to imply guilt. Because these "facts" allege evidence of multiple other offenders, suppression would be even more costly.

No evidence of a username, password, or website was ever provided to defendant or to the court, namely because it doesn't exist. Petitioner never provided this information to Agents. Where the AUSA got this information is a mystery as well. It appears in no police report, nor does it appear in any of the recorded interviews. In fact, despite

police attempting to acquire information to this effect from Petitioner in multiple recorded conversations, he never gives such information to them.

If true, the government ought to have provided any information derived from it, as it would have lead to multiple arrests and convictions, and qualified as "substantial assistance" & a downward departure.

In truth, the allegation was clearly false and such a blatant lie ought to have resulted in sanctions against the government for misconduct. This was a highly unethical move designed to poison upcoming proceedings by way of the "genesis doctrine", an oft-used tactic by the government wherein a baseless allegation is made, and if not refuted, becomes fact.

## I. Penis Comparison

Trial counsel claimed that the charged videos could not be viewed by Petitioner under any circumstances, and that Petitioner had to rely on counsel's review of them. Petitioner only recently learned that counsel allowed uninterested parties to view the videos, when he had claimed he was only sharing audio - something petitioner requested counsel not to do.

Counsel was asked to review the videos to confirm that several identifying features from Petitioner's body were not present. Originally, the idea of identifying markings was introduced when counsel claimed the AUSA had made comments suggesting he was considering hiring a comparison expert. Petitioner suggested that this was a good idea, noting several identifying features that might be useful in identification. Counsel said he would consider this. At the time, we also discussed the photos taken by Agent Lopez.

Later, the issue was brought up again. Counsel claiming the AUSA had decided against identification. When Petitioner urged him to conduct a comparison, counsel claimed identification would be impossible. Specifically, counsel claimed that at no time was the head of the penis exposed in the videos to compare Petitioner's scar to the penis in the video. Also not visible was enough of the penis shaft to discern whether it possessed

the same pattern of freckles as petitioners'. Lastly, Petitioner was experiencing a medical issue on his hands during the timeframe in which the videos were made, and this issue would have been visible on the hands. Counsel claimed the hands were not visible.

Petitioner was surprised at trial by the videos, and by the photos presented by the government. Not only because all of the identifying areas were clearly visible, but also because the government proffered photo was unrecognizable. Petitioner admits he was never shown the photos when they were taken, but the photo provided by the government does not resemble the Petitioner's body, except in the most rudimentary way. Either the photo is not that of Petitioner, or the government has withheld the photos most likely to refute an identification claim.

Counsel never made an attempt to collect the photos in the government's possession, or to collect our own photos for comparison. This allowed the government to make a surprise presentation of highly prejudicial material for which defense was not prepared to counter. Had counsel made an attempt, and been honest in his assessment of the videos, Petitioner could have proven conclusively that he is not the person in the videos.

This issue coincides with the identification of the hands counsel was asked to make. For this, counsel collected medical records to coincide with Petitioner's claims. Counsel never made an ID argument and even lied about contacting witnesses to corroborate the identification claim.

### J. Witnesses

#### 1) Government Witnesses

##### a) Lopez and Catalan

These two investigators worked together on the Louisiana end, and had worked together numerous other times. Trial counsel had been asked by Petitioner to research these agents for prior bad acts. This was requested due to the level of comfort the agents seemed to have while lying their way through the Louisiana investigation.

Counsel (again) claimed the AUSA would provide any relevant information on the

officers, and so, he would conduct no such inquiries. Petitioner has since found by
searching the USP Lexis Nexus that these agents have been implicated in wrongdoing
multiple times. The agents were both investigated by the FBI for witness tampering,
perjury, and suborning perjury. The agent investigating found that the claims had mer-
it, but that there wasn't enough evidence to bring criminal charges. The Louisiana
court seemed to indicate this as an exoneration (US v Wyatt, 5th Cir 2008). The two
agents were then implicated again, this time for lying to a grand jury. (US v Valdez,
5th Circuit 2013) (US v Delgado 5th Circuit 2013). Catalan was accused in 2015 by the
victim  in a child porn case of having elicited her statement (which was later used
to convict the defendant) in an unfair way - by coming to her home early in the morn-
ing, making her speak in front of her parents, being "pushy" and leading her to the
answers he wanted. (US v Callier, 5th Cir. 2015). The courts in Louisiana have repea-
tedly let these agents engage in abusive tactics, clearly abandoning their duty to
deter police misconduct. This pattern continued into this criminal case, with the
court again being reluctant to believe in bad acts by agents. Had counsel uncovered
this history sooner, these agents might have been effectively cross-examined, and the
court better informed on who was on the stand.

### b) Matthew Smith

Petitioner's brother declined to be interviewed by defense investigators. However,
he eagerly provided statements to government agents against Petitioner. Defense counsel
made no attempt to provide evidence countering M. Smith's known lies, nor did he att-
empt to call Smith to question him regarding his false testimony to police.

Although counsel was aware that almost the entire recorded interview of Matthew
was untruthful, counsel did not make an effort to put this information before a jury.
Matthew lied about everything from dates of employment, to uniforms, to having been
accused of raping an underage girl. He claims at the beginning of the interview that
he has had no knowledge of the case at all, yet then, after the recording stops, he

suddenly "remembers" a conversation he had with a family member (which he had prev-
iously claimed didn't happen) in which he was told that Petitioner was going to try to
"frame him" by saying "some boots were [his]". This interview occurred only a week
after petitioner discussed the neon-colored shoes in police evidence. Petitioner hadn't
discussed the shoes with anyone except counsel, and so this sudden remembrance by Matt-
hew, especially in light of the previous contradicting statements, seems suspicious.

    While it cannot be proved, Petitioner believes this information may have been
shared with government investigators by defense counsel.

    Other statements by Matthew indicate that he had access to the charged material -
he claims that his computer was left behind because it wouldn't hold a charge, when it
was Petitioner's laptop which would not charge.

    After counsel "learned" of Matthew's rape allegation (he was made aware by Pet-
itioner prior to disclosure by the AUSA) counsel claimed that the AUSA had told Matt-
hew not to answer any questions if he was called to testify. In reality, it was defense
counsel himself who urged the court to provide counsel to Matthew. Counsel then claimed
Matthew had "lawyered up" and could not be called as a witness. Subsequently, the jury
was never made aware of the lies and inculpatory statements Matthew had made. This was
especially prejudicial because the government then provided photos of Matthew, which
should have been reviewed prior to trial. Failure to provide Matthew to cross-examine
while providing "testimonial" photographic evidence violates the 6th Amendment's
right to cross-examination.

    After trial, defense counsel disclosed other information he had learned from the
AUSA which was not reported. According to counsel, Matthew had provided a lengthy
statement to investigators about a document known as "the list". The government pro-
vided this document during trial. According to root information included in discovery
and government exhibits, the document titled "the list" was located along with the
charged material on a password protected folder. This was the only location this doc-
ument existed, and so Matthew's knowledge of it proves that he had access to the mat-

erial Petitioner was charged with. When counsel was confronted with this fact by Pe-
titioner, he grew agitated and told Petitioner to concentrate on sentencing.

### c) Sue Morley

Sue was interviewed by Concord police on January 15th, 2016. She kept a detailed
day planner and had noted events during the timeframe of the charged video creation.

She gave a statement to police that she was home with the victim on the date of
creation, and that Petitioner was not alone with the girls on that date. On the date
of her statement, she also told police that the girls were excited to be visiting Pe-
titioner soon; at sentencing Sue claimed the girls were terrified and traumatized. Sue
could have testified about the medical condition on Petitioner's hand.

### d) Agent Desmarets

No attempt was made to contact Agent Desmarets. Considering the genesis of the
case rests solely on Agent Desmarets' testimony, failure to interview him was unreas-
onable. Agent Desmarets claimed to have found Petitioner on the Louisiana farm using
a "law enforcement database". The data from which was never produced, and likely false.
Desmarets claimed to have discovered that a Brad Smith with the same 603-833-9248 phone
number was associated with the Louisiana farm.

In reality, the 833-9248 phone was registered to Sabbow, Inc & had been lost/
stolen in November of 2014 and never replaced. This number had not been used by Peti-
tioner for nearly a year prior to becoming associated with the Louisiana farm. (See
Photo Deliveries call 998-4039). Likely, Desmarets linked the 833 number to Sabbow,
Inc. and was able (through guile) to acquire the farm location from Sabbow employees.
Petitioner still held a New Hampshire driver license and registration (Kibodeaux's
Police Report, Knock and Talk Photo of Petitioner's Vehicle) Petitioner's NH mail had
been forwarded to Petitioner's sister's address in NH. Agent Lopez could not find any
link to Petitioner on the Louisiana farm. Further, the information acquired by Desmarets
from Yahoo! indicated access by a person in Pennsylvania.

Counsel's failure to investigate this witness left the whole genesis of the case unchallenged, and assumed the truthfulness of government "FACTS".

## 2) Other Witnesses

Defense counsel was given on multiple occasions, names of people Petitioner wished to interview for various reasons. Each witness could corroborate a seperate position of Petitioner's testimony. Of these, defense counsel picked only a few to actually interview. Many others were never interviewed, although counsel claimed to have made attempts to interview several of these who refused to speak, or had given unhelpful answers. Petitioner later discovered that no one had attempted to contact these witnesses.

### a) Danielle Hebert

Danielle and Petitioner were dating until Petitioner's arrest, and she was willing to testify on Petitioner's behalf. After trial, Petitioner learned Danielle had not been contacted by trial counsel, when counsel had claimed Danielle had refused to answer questions. Appellate counsel confirmed this during interviews with Danielle.

Danielle had information on identification and could have testified on the medical issue, which would have been visible on the Petitioner's hand during the timeframe the charged videos were created (See Medical Records from Merrimack Valley Occupational Health, available from Defense counsel). She also had recently purchased the new sneakers Petitioner wore to trial, size 9. She could also have testified to the age of Petitioner's laptop, and that she had her own username on the laptop, and used the laptop to access her own accounts - something the defense forensic examination was unable to discover - suggesting strongly that the device data was altered to remove any evidence of other users, OR that the defense forensic exam was ineffective.

### b) Lisa Leblanc

Lisa was the tenant on the Louisiana property, and could have testified to the facts as alleged by Petitioner.

Lisa was the caretaker for her elderly mother who couldn't climb stairs or drive, and her 20 year old autistic son who also required close supervision. The Leblancs had two family dogs that stayed with them in the main house on the farm. Lisa's vehicle was parked in the carport when agents arrived on the farm, meaning Lisa, her Mother, her son, and two dogs were home in the main residence. (See Suppression Day 1 - Kibodeaux, "There were 3 cars in the driveway", also Supp. Day 2 - Smith) This court suggested that defense ought to have provided Lisa as a witness on the matter. (Supp. Order Note 4).

Counsel had been asked to subpoena Lisa Leblanc for suppression hearing, but claimed that she would be unhelpful, as she claimed not to live there anymore. This revelation was made very shortly before the suppression hearing, and Petitioner was not able to convince counsel to call Lisa anyway. Petitioner confronted counsel with a consent to search form signed by Lisa Leblanc two weeks after these events occurred to search the farm's garage. Counsel claimed he would look into it, but never did. Later review of investigator's notes revealed that no effort was ever made to contact Lisa. Petitioner would agree to a review of these notes by the court, however, will not make them available for government review.

The prejudice here is clear, as the court noted this witness specifically in its suppression order. Lisa's testimony here would address the officer's credibility, and also to the legality of police behavior on the farm. This is the second witness defense counsel lied about contacting, making this a pattern of unethical, unreasonable conduct.

### c) Meghan Hanna-Stevens

Meghan was the only other witness on the farm during the knock and talk, and was helping dig the trench across the backyard. Meghan told federal investigators that Agent Catalan spent approximately half of his time on the farm outdoors with her near the excavator (See HSI Interview Notes - Meghan Hanna-Stevens).

This directly contradicts the testimony from all three Agents involved, and corroborates Petitioner's (See Suppression Testimony). She could have provided testimony about the police's behavior, (whether they were commanding, whether she felt free to move around, whether her ID was requested or demanded). She could have provided testimony about how police entered the back yard, where the trench was, and the septic lines we were digging around. She could also have offered testimony about the security cameras, the police's removal of the moulding, and other information about Petitioner's home. Meghan also made statements in jail calls shortly after Petitioner's arrest, suggesting the police were badgering her for statements after Petitioner's arrest, as well as the pressure she received to allow a warrantless search of Petitioner's vehicle - which went unreported (See Meghan Hanna-Stevens Jail Calls).

Meghan's independant experience of police's coercive behavior was an invaluable source of information the court should have had to evaluate. Counsel made an attempt to reach Meghan only very near the suppression hearing, nearly a year after these incidents happened, and chose not to call her as a witness when she requested not to be contacted for further interview after several dates were changed which she had requested time off from work and made travel plans to come from South Carolina. Counsel's late effort, and many frivolous continuances contributed to his failure to conduct a successful interview. Nonetheless, counsel had ONLY one witness to these events, and there is no excuse for not calling her to testify.

Counsel had a nasty habit of making half hearted attempts too late in proceedings to correct if he failed.

### d) Scott Smith

Petitioner's father was in contact with Petitioner until his arrest and knew intimately some of the details associated with Matthew Smith's hiring and firing. Scott could have provided information on Matthew's access to Petitioner's belongings, uniforms, shoes, the laptop, etc. Trial counsel claimed he was unable to contact Scott

Smith until after trial.

### e) Toni Mitrano

Petitioner's ex-girlfriend, was aware that the Smittvb172 account was compromised and in use by someone else. Toni could have identified the laptop, she knew about issues with Matthew Smith, and was aware of the loss of the 833-9248 cell phone, which may have been associated with the Yahoo! account. Toni was never contacted.

### f) Molly (Ganse) Mills

Molly was the single best witness on the issue of the Petitioner's shoes. Molly was Petitioner's good friend, and hated Petitioner's sneakers, of which he had only one pair, which annoyed her. She could positively identify the shoes in evidence as NOT Petitioner's. Petitioner had last seen Molly in November, shortly before he returned to NH, still wearing the shoes she hated.

## K. Laptop Forensics

Defense counsel did not attempt forensic review of electronic devices until immediately prior to trial. This court granted counsel's continuances but admonished counsel for not having completed inspection sooner. (See Court order on Continuance       ) Defense counsel had sprung the continuance last-minute, which forced Petitioner to agree, although counsel was aware Petitioner did not wish to continue.

In a letter from counsel, Mr. Levin berates Petitioner for  lying about the devices contents, which had been discussed. Petitioner had asked counsel to look for evidence of computer crashes, any links to Yahoo!, installation of TOR program, installation of Eraser program, and evidence of other users.

Counsel claimed not to find evidence of any other user, although there were at least two others. No evidence of any email other than Yahoo! (This is refuted by Google records, Yahoo! logins, and Danielle Hebert used a Google account on Petitioner's machine). Counsel did not discover the unprotected access by federal agents that they admitted to.

Because the data from this exam does not match that of independant sources, it can be reasonably assumed that either the data was altered, or the exam was not conducted effectively. Because this was conducted so close to trial, there was no time to review the findings and take a second look... Another instance of poor planning which proved costly to Petitioner.

Counsel made no physical examination of the actual devices to test the battery issue alleged by Matthew Smith.

### L) Yahoo Account Hacked!

Counsel was well aware that this account had been hacked. Jail calls show this (Jail call, Toni Mitrano), other calls show that Petitioner claimed very early to have told police he didn't use Yahoo!. Levin claimed that there was no evidence of any compromise, and never shared the Yahoo! logins with Petitioner. (See Yahoo! IPs, whois.com) Yahoo! has since disclosed that nearly all of it's accounts have been compromised multiple times in recent years (See Yahoo! Class Action Ad). Counsel's untruthful claim that there's no evidence of a compromise was a large attempt to push Petitioner into a plea deal, a tactic which he used multiple times despite having been told in March 2016 that Petitioner would not accept a plea.

### VI. Misrepresentations / Withholding Discovery/ Incorrectly Advised About Law

### A) Discovery

Trial counsel spent less than an hour total reviewing the full discovery file with Petitioner - tens of thousands of pages.

Large portions of the discovery file were never shared. Consequently, Petitioner never saw the Yahoo IPs, the photos from the second search, (which included photos of the trench abutting the walkway - not in a pecan field, further evidence of camera tampering, evidence showing the eviction notice was never correctly served). Nor did he share the victim advocate interview or the results from the forensic rape examination which returned a negative result for penetration of Reagan Morley.

Additionally, counsel never shared the contents of his unofficial conversations with the AUSA, wherein much unreported information was shared. Because of this, Petitioner was unable to challenge claims effectively or to present evidence favorable to the defense.

## B. Incorrect Advice

### 1. Uncharged Conduct

Counsel urged the Petitioner to admit to uncharged conduct, claiming the contents of the uncharged videos was not pornographic, and could not be used in any proceeding against him. Petitioner was surprised by the production of these other images, as they were much different that counsel's representation of them. Counsel's claim that at worst, the images represented a state crime of "invasion of privacy" was incorrect & obviously prejudicial, and counsel ought to have known better. (See US v Poulin, 592 F.Supp.2d 137 (1st Cir 2008), US v King,  741 F.3d 305, 1st Cir. 2014) - Both similar cases where court determined a federal crime had been committed) Counsel's advice was clearly wrong, and admission was prejudicial both at trial and in sentencing where conduct was used to establish a "pattern of behavior" for +5 points.

### 2. Ruse

Attorney Levin's concession without argument to the idea that Ruses are legal and his subsequent advice to Petitioner to abandon the issue was clearly incorrect in light of the wealth of case law to the contrary, Federal statutes authorizing warrantless inspections, etc.

### 3. Stored Communications Act

Trial counsel's advice regarding the SCA and its extra-territorial authority was clearly wrong, and resulted  in the failure of this court to rightly decide the suppression claim.

## C. Misrepresentation of Fact

Trial counsel placed himself as the repository of facts during the pre-trial phase

of this case, forcing Petitioner to rely on counsel's word, rather than being able to evaluate the facts himself. Counsel's misrepresentations of the following facts prevented Petitioner from effectively arguing against government theories.

### 1. Contents of Charged Videos

Counsel claimed that the penis was not exposed enough to note defining features, specifically the penis head was not exposed. Counsel also claimed the hands of the adult were not visible to inspect for identifying marks.

### 2. Witnesses

Scott Smith - Counsel claimed Scott failed to respond until the sentencing phase.

Lisa Leblanc - Counsel claimed Lisa had not still lived on the farm at the time of the knock and talk.

Danielle Hebert - Counsel claimed he had made multiple attempts to contact Danielle but Danielle refused to be interviewed.

Counsel also shared the contents of the charged videos with witnesses after specifically being asked not to. Counsel agreed, then shared the videos anyway. This was stressing and traumatic to Petitioner's family and friends.

• Counsel claimed he could have the sentence for federal charges committed to state prison in New Hampshire in order to coerce into a plea agreement.

• Counsel claimed to be conducting investigations to justify continuances, many times, no investigation was occurring.

• Possibly lied about findings of forensic exam on electronics.

• Lied about possibility of reviewing charged conduct.

• Lied about prosecutor urging Matthew Smith into seeking counsel and refusing to testify.

### VII. Failure to Challenge Sentence

The sentencing court incorrectly grouped charges under §3D1.2. Under the definit-

ions of "groups of closely related counts", all counts should have been grouped together. The charges clearly fit the description for either §3D1.2 (a) or (b), where they involved the same victim, and the same act or transaction (or) two or more acts connected by a common criminal objective or constituting part of a common scheme or plan.

Additionally, the reason this court found for specifically seperating count 6 into its own group - that the act of penetration was a seperate offense, seperate enough to have had an enhancement created by Congress specifically for it. §3D1.2(c) clearly establishes that,

> "When one count embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts", those counts are to be grouped.

Here, the specific reason the court used to ungroup Count 6, Congress intended the court to have included it within a single group. To prevent double-counting, the counts must be grouped, and Petitioner resentenced within the guideline range, for a maximum of 30 years. Counsel had ample opportunity to challenge this abuse of discretion, yet chose to appeal on other issues.

### VIII. Failure to Challenge Credibility Determination

This court found in favor of the government on the suppression issues presented pre-trial, not because of evidence presented, but largely because of its own credibility determination. Particularly, this court credited Trooper Kibodeaux's testimony throughout the proceeding. Trooper Kibodeaux was perhaps the least credible witness, and this courts ruling on credibility was an abuse of discretion, allowing the police's bad acts to the shielded by the court's findings. It is clear that the court was more concerned with the gravity of the offense than the fair execution of the law. Fortunately in 1985, the US Supreme Court heard Anderson v City of Bessemer City, N.C., 470 U.S. 564 (1985) and created a mechanism for addressing this particular type of abuse in the lower courts. The First Circuit has recognized this remedy for wrongful credibility determinations as recently as US v Henderson, 463 F.3d 27 (1st Cir. 2006).

Defense counsel should have addressed this issue as it colored the rest of the case going forward. Kibodeaux's testimony as it would have been observed by the court was stiff and robotic, and sounded like a computer reading her report verbatim rather than reciting from memory events which actually occurred. Kibodeaux stammered, choked on words and appeared extremely uncomfortable on the stand. This is not the demeanor of a person giving an account of events that have no bearing on their own lives. When attempting to make a point, her voice sounded forced, rehearsed. When asked details based on her own report, she couldn't remember them.

Kibodeaux's testimony was markedly different than that of the other officers, and was disputed by evidence as well. Because her testimony was specifically credited, I will address it here.

## A. Kibodeaux Claimed There Were No Cameras at the Gate

This was an original claim by Kibodeaux which was supposed to lessen the effect at the gate to eliminate police license to enter. This was immediately challenged by defense with photos of the gate provided by the government marked "knock and talk". Kibodeaux then claimed she didn't remember, which raised issues of credibility immediately - either she knew the camera was there and authoritatively declared it not to be, hoping the evidence didn't exist, or, she didn't remember, and authoritatively declared the camera didn't exist anyway.

## B. Kibodeaux Claimed Not to Have Taken Photos in the Carport or Anywhere on the Farm During the Knock and Talk

Later, Kibodeaux admitted to taking photos inside Petitioners home during this time with her cell phone. Petitioner testified that he observed Kibodeaux taking photos in the carport with her phone. Photos provided by the government in a folder labeled Knock and Talk (which include the photos taken indoors) show the photos were taken by someone, and close inspection of the reflection in the photo of the Petitioner's Tahoe reveals a silhouette which closely resembles Trooper Kibodeaux.

Kibodeaux tried to equivocate, claiming that whoever took the photos could have used a zoom feature, but the angle of the photo precludes this possibility.

## C. Kibodeaux Claimed the Gate Would Open "A Couple of Feet"

Photos produced by the government to back this testimony show the gate is being twisted, as if the two gate sections are being pried apart from the top. Even though enough force is being applied to twist the gate frame, the two sections are still only a couple inches apart at the bottom. Agent Lopez testified that if the gates opened enough to walk through, they would have gone that way, indicating the police checked the gate prior to climbing through sideways. This testimony makes more sense, considering the agents intended to drive, not walk up the driveway.

Kibodeaux's testimony is facially implausible here. How, if a mechanical automatic gate could "give" a "couple of feet" would the gate ever close properly? Why did police not check the gate prior to climbing through sideways? How was a "couple of feet" of slop not detected prior to climbing through?

## D. Kibodeaux Claims to Have Spotted Petitioner From Driveway, Working in a Pecan Field

Both Kibodeaux's and Lopez's original reports indicate Petitioner's location as "behind the garage". This location was only changed after Petitioner raised a 4th Amendment claim. "Behind the garage" indicates an area within the privacy fence. (See Attached Diagram, Google Earth Photos). Kibodeaux revised her positioning at suppression and indicated a place near the side of the garage by pointing to it on a photo provided by the government. There is no trench in this photo, nor is there any evidence of digging. Photos from the January 26th, 2016 search of the property taken near the time of the encounter show the trench was in the backyard, within the privacy fence, and not in a pecan field. Kibodeaux is even heard in the video interview at State Police headquarters discussing with Petitioner that she recalls Petitioner talking about trying to avoid septic lines in the yard. Where did the side-yard theory come from anyway? During testimony, the court asked leading questions, directing the agents to the explanation

it then cites as fact.

This side-yard explanation is facially flawed as well. This area is clearly visible from in front of the carport. If police could clearly see and hear two people and a noisy excavator, and could clearly see that no one was in the carport, and the purpose of a knock and talk is to attempt to make contact with the occupant, then why did police enter the carport and take photos without making contact? Either the police lied, and Petitioner was not visible from the driveway and the machinery was not making noise, and they decided to try and gather evidence that Brad Smith lived on the farm by entering the carport and taking photos, or, police heard and saw Petitioner but decided to engage in a warrantless search anyway.

### E. Petitioner Physically Held Agent Lopez's Badge

It is highly unlikely an agent would reliquish his badge folio, and in this case, the agent in question testified he didn't think that happened which agreed with Petitioner's testimony. This is also highly unlikely due to the fact that Petitioner later asked the agents "Who do you work for?" during the recorded portion of the interview.

### F. Kibodeaux's Badge Was Clearly Visible

Kibodeaux's police badge was worn on her hip, she admits to wearing a brown jacket, which would have covered her badge. While it is true that the jacket had a Louisiana State Police Badge embroidered on the chest, the Louisiana State Police badge is in the shape of the State of Louisiana, and Petitioner was unfamiliar with such imagery.

### G. Kibodeax Claimed to Have no Knowledge of Home Cameras Until She Was Told About Them After the Warrant Search.

This is immediately refuted by her own words during the recorded interview at the police station - Before the Warrant Search - "you obviously have cameras in your room..."

So Kibodeaux was aware at least of the upstairs cameras before the search, and likely before then - Search photos show that the kitchen camera was removed prior to 8:45pm and the other cameras have been turned to face the walls, preventing them from recording

the police in the Petitioner's home. Kibodeaux claims to have noticed wallet sized photos on the side of Petitioner's refrigerator, but failed to spot the camera prominently displayed on a shelf, even after Agent Lopez brought everyone's attention to the shelf by asking if the copper tubing was a still. Nor did she spot the two large silver cameras mounted on the walls (or the smaller black camera) in a room only 15' x 16' that she entered three times.

### H. Kibodeaux Claimed Petitioner Admitted to Using Yahoo!

Petitioner denied this claim, and later learned the Yahoo! records vindicated him on his testimony.

### I. Kibodeaux Claimed Petitioner Knew He Had Been Arrested at the Police Station

In the recording from the police station, prior to being interviewed, Petitioner asks the guard officer, "Am I not going home tonight?" This is a clear indication that Petitioner was not aware he was "arrested". Petitioner's testimony supports that claim.

### J. Kibodeaux Testified That She Asked Catalan to Begin Recording Because Petitioner "Began Opening Up..."

Careful examination of the audio shows that no incriminating statements are included in this recording. To the contrary, Petitioner's statements use terms which exclude himself. Where the police claim Petitioner claimed he couldn't help himself he actually says "They can't help themselves... We have to give them..." (Emphasis added) Where the police claim Petitioner admitted to using Yahoo!, he is recorded saying (speaking of the trading of pornography) "I don't send it, I don't know."

This statement is also contradictory to her whole previous assertion that Petitioner was open and honest throughout the encounter.

### K. Kibodeaux Claims the Bulk of the Encounter was Recorded by Agent Catalan

Any review of this claim would destroy her testimony utterly. She testifies that Petitioner gave many incriminating statements, questioned the consequences of refusing

consent, answered questions about pornography generally, heard a consent form read, gave consent several times, and discussed the activity on the Yahoo! account, all of which was unrecorded. According to Kibodeaux's conflicting testimony, simultaneously, more happened outside the recording, and less happened outside the recording.

### L. Kibodeaux Claimed Petitioner Invited Agents into His Home

Petitioner testified that he did not want police in his home, and was specifically told agents needed to see inside to make sure Petitioner wasn't hiding any mexicans. Agent Lopez confirmed that he specifically requested to enter my home, although out of concern for my privacy - Despite being hundreds of feet into a farm.

### M. Kibodeaux Testified Petitioner Admitted to Possession on Laptop, Providing Probable Cause.

This story doesn't hold up when one considers that police lured Petitioner to the station with the ruse of collecting his belongings because they had not found contraband on them. Why would Petitioner believe this ruse when he had confessed already?

### N. Basic Story Flaws

- Kibodeaux admits there were 3 vehicles in driveway, yet then claims no one was home when she knocked.
- Claims encounter was consensual, but did not inform Petitioner he was free to end the encounter UNTIL police had entered his home.

Kibodeaux's credibility is further weakened by her actions in proceedings surrounding this encounter. Of the three "ruses" used by investigators, Kibodeaux was involved in two of them, showing she was comfortable using false statements to achieve her goals. Kibodeaux further lied to Petitioner multiple times - claiming he couldn't leave until he answered questions, claiming she would return his cell phone, claiming she had charged someone else in similar case, and he had been released within a year, claimed to be Petitioner's attorney to effect a visit at the jail, gave the impression she was an attorney when contacted by Petitioner's sister in order to get statments from family.

Kibodeaux's warrant application claimed search terms used by Petitioner included terms known to her to be "common child porn" search terms. Then lists those search terms: "Vicky Vette", "Peter North" (Adult Film Actors) "Blowjobs" and "threesomes" (Common Adult Porn Search Terms) None of the terms have any relation to child porn by themselves. Kibodeaux then failed to report many facts that might have looked bad to the police.

- Failed to report the conditions at the gate which revoked "implied license" in Louisiana

- Failed to report seizure of firearms, paint additives (Marked "thermite)

- Failed to report seizure of kitchen camera

- Failed to report disposition of home security film

- Failed to report search of cell phone

- Failed to report search of Petitioner's Tahoe

Kibodeaux questioned Petitioner at police station after he had previously requested an attorney. Later, after Petitioner had signed miranda warning invoking his rights unequivocally, she attempted to question him again.

Kibodeaux unquestionably acted in a manner that would cause a normal person to question her word. Her mannerisms in court, her inability to recall details if they were detrimental to the government's case, and her internally inconsistent and facially implausible statements, many which were refuted by other evidence, all lead to the conclusion that this was done purposefully, to prevent Petitioner from being released on a technicality - regardless of how wanton the police malfeasance was.

Counsel was ineffective for failure to address these issues even though they were clear.

## IX. Cumulative Error

Finally, if the court finds that the above claims are insufficient on their own

to merit relief, Petitioner requests the court consider the claims in their aggregate in determining if relief is warranted.

### Requested Relief

For the reasons above, the court should find that defense counsel acted in a manner that was Constitutionally ineffective by failing to raise claims of constitutional magnitude, failing to investigate or discover evidence or corroborate Petitioner's testimony, failing to fully develop the claims that were raised, or to investigate and argue the claims beyond initial presentation. By being dishonest to Petitioner and the court, failing to present evidence of actual innocence, and incorrectly advising about the law, as well as the issues this court has already litigated.

This court should also find that the government acted in a manner that is Constitutionally offensive by withholding evidence, tampering with evidence, and for purposefully circumventing the law to achieve their goals by frequently engaging in Constitutional violations, which then go unreported.

Petitioner requests the following relief:

1) That the court vacates Petitioner's conviction and remand for new trial based on new exculpatory evidence, ineffective assistance of counsel, and various constitutional violations

2) Orders the evidence in the government's possession to be preserved and procured. Petitioner will file a request for specific discovery.

3) Orders discovery to be produced by former defense counsel in its entirety, as it has never arrives as requested.

4) Orders a hearing for resentencing

5) Orders an evidentiary hearing

6) Authorizes Peitioner enlarged time to file an amended §2255 motion due to failure to receive discovery from counsel, BOP interference, and issues arising from execution related shutdowns, and COVID-19 related lockdowns at USP Terre Haute.

7) Orders a disinterested 3rd party to investigate the criminal actions by the government and law enforcement as it pertains to this case

### Affirmation

I, Brad Smith, Petitioner in this matter, pro se, do hereby affirm under pains & penalties of perjury, that the aforegoing facts, claims, and evidence are true to the best of my beliefs and abilities.

Date: __10/6/20__                                    _____
                                                     Brad Smith

### Certificate of Service

I, Brad Smith, Petitioner in this matter, pro se, do hereby certify that I placed a copy of this motion in the hands of prison officials utilizing the prison legal mail service by US Mail Post Paid this _6_ Day of October, 2020.

                                                     _____
                                                     Brad Smith